Ellis v. State.

## ELLIS v. STATE.

## (*Knoxville.* November 18, 1892.)

1. COURTS. *Legislature has power to establish special Courts.*

   Doctrine re-affirmed that the Legislature has power to create and establish special Courts. (*Post, pp. 88–92.*)

   Constitution construed: Art. VI., Sec. 1.

   Cases cited and approved: Moore *v.* State, 5 Sneed, 512; Wilcox *v.* State, 3 Heis., 114.

2. SAME. *Same. Not a removal of the seat of justice.*

   And a statute establishing a special Law Court for five of the seventeen civil districts of a county, to be held at a place other than the county seat of such county, is not in conflict with that clause of the Constitution which forbids the removal of "the seat of justice of any county * * * without the concurrence of two-thirds of the qualified voters of the county." The establishment of such special Court does not operate to remove "the seat of justice" of the county. (*Post, pp. 89–97.*)

   Constitution construed: Art. X., Sec. 4.

   Act construed: Acts 1891, Ch. 26.

   Cases cited: Stuart *v.* Baer, 8 Bax., 141; Cole Mfg. Co. *v.* Falls, 90 Tenn., 469.

3. SAME. *Same. Same.*

   And a provision in such statute that where such special Court has jurisdiction of the cause of action, it may issue counterpart writs for joint defendants residing in the county, but outside the Court's territorial jurisdiction, does not affect the question of the constitutionality of the statute. (*Post, pp. 95, 96.*)

4. JURY. *Selection from part of county.*

   The provision in a statute establishing a special Court for part of a county, requiring jurors, grand and petit, to be selected for that Court from that portion of the county alone embraced within the

jurisdiction of the Court, is not in conflict with the constitutional guaranty to the accused of a "speedy public trial by an impartial jury of the county." (*Post, pp. 97, 98.*)

Constitution construed: Art. I., Sec. 9.

Act construed: Acts 1891, Ch. 26, Sec. 5.

5. SAME. *Objections to grand jury too late, when.*

Objection that grand jury were selected from residents of part only of the county, if tenable at all, comes too late when made for first time by motion in arrest of judgment. (*Post, p. 98.*)

Cases cited and approved: State *v.* Cole, 9 Hum., 626; McTigue *v.* State, 4 Bax., 314; Turner *v.* State, 89 Tenn., 559.

6. SAME. *Proper practice when incompetent jurors are discharged before jury are sworn.*

Upon trial of murder case, after eight jurors had been selected, it was discovered that two of that number had expressed opinions adverse to defendant, and were therefore incompetent. These two jurors, after full investigation, were discharged. Defendant's counsel then moved the discharge of the other six jurors, they having associated with the two incompetent ones. The Court re-examined the six jurors, and, finding that they had not been contaminated by their association with the two, refused to discharge them.

*Held:* The Court's refusal to discharge the six jurors was correct. (*Post, pp. 99, 100.*)

Cases cited and approved: Taylor *v.* State, 11 Lea, 720; Boyd *v.* State, 14 Lea, 169.

7. SAME. *Disqualification of, after verdict. Examples.*

After verdict in murder case, two of the jurors were attacked by evidence tending to show that they entertained opinions adverse to defendant when taken on the jury. Each juror was proven by three witnesses to have expressed opinions that defendant was guilty. Both jurors deny the statements of the attacking witnesses, and prove for themselves good character. Both jurors deny any knowledge of the facts of the case prior to going on jury. There is no proof that they knew or had heard the facts of the case. Their statements to attacking witnesses did not indicate that they had heard or known the facts. The trial Judge refused new trial upon this evidence.

*Held:* This Court will not overrule the action of the Circuit Judge upon this point. (*Post, pp. 100–105.*)

Ellis *v.* State.

Cases cited and approved: Mann *v.* State, 3 Head, 373; Rader *v.* State, 5 Lea, 613; Spence *v.* State, 15 Lea, 547; Johnson *v.* State, 11, Lea, 49.

8. EVIDENCE.  *Communications to an attorney not privileged, when.*

An attorney at law who is not attorney for the defendant in a criminal case, is competent to prove the defendant's confessions of the crime, made in his presence, although he may have been spoken to, but not employed, for the defense. (*Post, pp. 105, 106.*)

9. SAME.  *Erroneous exclusion cured by subsequent admission of the evidence.*

If, after evidence has been erroneously excluded, it is subsequently admitted, there is no reversible error in the exclusion. (*Post, pp. 106, 107.*)

---

FROM ROANE.

---

Appeal in error from Circuit Court of Roane County.  S. A. ROGERS, J.

L. A. GRATZ and YOUNG & YOUNG for Ellis.

Attorney-general PICKLE, W. L. WELCKER, and T. A. WRIGHT for State.

T. S. WEBB, Sp. J.  Plaintiff in error was indicted in the Law Court of Rockwood for the murder of a woman named Mollie Scott, alias Mollie Reed.  At the April term, 1892, of said Court ,he was convicted of murder in the first degree, with mitigating circumstances, and was sentenced to, imprisonment for life in the penitentiary.  He filed

motions for a new trial and in arrest of judgment, which were overruled, and he has appealed.

In the Court below the prisoner filed a special plea in abatement, averring that the Law Court of Rockwood had no jurisdiction to try him upon the indictment, for the following reasons:

*First.*—Because the county seat of Roane County, Tennessee, being the county in which it is charged the offense was committed, is the town of Kingston, while he is arraigned and charged, and is about to be tried, in the town of Rockwood, in said county, in a Court called in the indictment "Law Court of Rockwood."

*Second.*—Because the Act of the Legislature (Chapter 26 of the Acts of 1891) establishing said Law Court of Rockwood, and giving to it exclusive jurisdiction for the trial of offenses committed in the sixth, seventh, eleventh, twelfth, and thirteenth districts of Roane County, is unconstitutional and void, and confers no jurisdiction upon said Court.

The Attorney-general demurred to this plea, and the demurrer was sustained and the plea overruled, and the prisoner put upon his trial on the plea of not guilty. The demurrer is not copied into the transcript, but the judgment of the Court sustaining the same adjudges "that the Act of the Legislature establishing the Law Court of Rockwood is constitutional."

The reasons in arrest of judgment renew the objections to the jurisdiction, as made in the plea,

Ellis *v.* State.

viz.:. That the Court was held away from the county seat, and that the Act of 1891 was unconstitutional and void; and, in addition thereto, claim (1) that the jurors who tried the case were drawn from the sixth, seventh, eleventh, twelfth, and thirteenth civil districts alone of Roane County, and no other jurors from any other districts were presented to the defendant, although the county is composed of seventeen districts, whereas the prisoner was entitled to be tried by a jury "taken from the body of the county;" and (2) that the grand jurors finding the indictment were selected from said five districts of Roane County, and were "sworn, charged, and impaneled" at a place called Rockwood, which was not the county seat.

Whether or not these objections made in the plea, and in the reasons in arrest of judgment, are valid, depends upon whether or not the Act of 1891, establishing the Law Court of Rockwood, is unconstitutional and void. If that Act is unconstitutional and void, then the prisoner has been tried, convicted, and sentenced by a tribunal having no legal existence. If that Act is constitutional and valid, then said objections are invalid, and furnish no grounds for arresting or reversing the judgment, and we will then be at liberty to consider the other questions relied upon by counsel, but not yet stated in this opinion.

The Act in question was approved January 27, 1891, and is as follows:

"SECTION 1. That there shall be held at Rock-

wood a Common Law Court for the sixth, seventh, eleventh, twelfth, and thirteenth civil districts of Roane County, to be called the 'Law Court of Rockwood,' and to constitute one of the Courts of the Third Judicial Circuit, and to be held by the Judge thereof, with common law jurisdiction, original and appellate, over all cases arising at law within said civil districts of a civil, commercial, or criminal nature, and that the Attorney-general of said third circuit shall attend said Court and transact the business appertaining to his office thereat.

"Sec. 2. That the Law Court of Rockwood has general common law jurisdiction, original and appellate, in all cases at law of a civil or criminal nature, arising in the civil district named in the first section of this Act, and that no resident of said district shall be sued in the Circuit Court of Roane County, Tennessee, in any transitory action, and only in such cases as he might be sued in said Circuit Court if he were a resident of any other county or State, nor to be presented or indicted therein unless the offense was committed in the county outside of the districts named in the first section of this Act. When the Court hereby established has jurisdiction of the cause of action, counterparts of writs may issue from said Court for joint defendants residing out of said districts, as are issued by the Circuit Court of the State to other counties, and counterparts may issue to any other counties in the State as in Circuit Courts.

"Sec. 3. That the Law Court of Rockwood

Ellis *v.* State.

shall have all the power and jurisdiction, within the local jurisdiction named in the first section of this Act, that belongs by law to the Circuit Courts of this State.

" SEC. 4. That the Judge of said Court shall, at each term thereof, order the impaneling of a grand jury, which shall have the same powers, within the limits of said civil districts, and be governed by the same laws, as other grand juries are.

" SEC. 5. That the County Court of Roane County shall designate, and cause to be summoned by the Sheriff or his deputy, a sufficient number of the resident citizens of the civil districts named in the first section of this Act to serve as jurors in said Court; *Provided*, The jurors for the first term of said Court, to be holden on the third Monday in April, 1891, shall be designated by said County Court at its April term, 1891."

Section 6 provides for the transfer of certain causes from the Circuit Court to the Court at Rockwood.

Section 7 requires the Sheriff to appoint one or more deputies, who shall reside within the local jurisdiction of the Rockwood Court.

Section 8 makes the Clerk of the Circuit Court the Clerk also of said Rockwood Court.

Section 9 provides that the expenses of the Rockwood Court shall be paid out of the treasury of the county, as the expenses of the Circuit Court are paid.

Section 10 fixes the times for holding the Rockwood Court.

Section 11 provides that the Act shall take effect from its passage.

The counsel for the prisoner contends that this Act is in violation of Section 4 of Article X. of the Constitution of the State. That part of said section which is claimed to be violated by the Act is as follows: "Nor shall the seat of justice of any county be removed without the concurrence of two-thirds of the qualified voters of the county."

The power of the Legislature to establish special Courts, under Section 1 of Article VI. of the Constitution, is well established, and is not denied in this case. *Moore* v. *The State*, 5 Sneed, 512; *Wilcox* v. *The State*, 3 Heis., 114.

But, while conceding the general power to establish special Courts, the contention is, that the Legislature has no power to establish a special Court at any other place in a county than the county seat; and, that the establishment of such a Court by the Legislature at a place other than the county seat, is to remove the "seat of justice" "without the concurrence of two-thirds of the qualified voters of the county."

The Act of 1891, which we are considering, does establish the Law Court of Rockwood at the town of Rockwood, while the county seat is at Kingston.

The question, then, is squarely presented, whether an Act of the Legislature, establishing a new Court at a point other than the county seat, is a

Ellis v. State.

removal of the seat of justice. If the Act has this effect, either directly or indirectly, then it is plainly in violation of the Constitution, and it will be our duty to declare it void, as was done in the case of *Stuart* v. *Baer*, 8 Bax., 141–146.

Our decision must be arrived at by construing the Act of 1891. In the case of *Cole Mfg. Co.* v. *Falls*, 6 Pickle, 469, this Court announced the rule "that all intendments are in favor of the constitutionality of an Act of the Legislature, passed with the forms and ceremonies requisite to give it the force of law; and that, where one construction will make a statute void on account of conflict with the Constitution, and another would render it valid, the latter will be adopted by the Courts, even though the former, at first view, be otherwise the more natural interpretation of the language used. Every reasonable doubt must be solved in favor of the legislative action."

The "seat of justice," within the meaning of the Constitution, is what is commonly called "the county seat." It is the place where the court-house and the jail and the county offices are located; the place where the Chancery and Circuit and County Courts are held, and where the county records are kept. The seat of justice is located with reference to the convenience of the citizens of the county. After it is located, the County Court is required by law to erect "a court-house, jail, and other necessary county buildings." Code, § 408.

The money to purchase the land and erect the buildings is raised by taxation. The citizens of the county pay the taxes. The land and buildings cost a large sum of money. The buildings are modeled and constructed with a view to the purposes for which they are to be used, and are not adapted to other purposes. A removal of the seat of justice would leave this property, for which the citizens of the county have paid in taxes, on the hands of the county, to be held at a total loss, or sold at a great sacrifice; and the citizens must be immediately taxed for the purpose of building a new court-house and jail and other county buildings at the new county seat. Moreover, the county seat might be removed to a point very inconvenient of access to a majority of the citizens. Thus, any arbitrary removal of the county seat might subject the citizens of the county to both pecuniary loss and great inconvenience. To prevent these hardships, the Constitution has expressly provided that county seats shall not be removed without the concurrence of two-thirds of the qualified voters of the county.

The Act of 1891, establishing the Law Court of Rockwood does not attempt to remove the seat of justice from Kingston to Rockwood. The court-house, jail, and other county buildings are left at Kingston. All the county offices are left there. The existing Courts are to be held there just as before the Act. The seat of justice is left just where it was and just as it was. The county is

not burdened with any pecuniary loss. But the Act requires that the county shall bear the expenses of holding the Rockwood Court, and it is claimed that this is an additional burden imposed upon the county without its consent. This claim is true; but it would be equally true if the new Court had been established at Kingston instead of Rockwood. In that case, it might have been necessary for the county to enlarge its court-house, or build a new one, for the new Court, and yet the county could not object to the Act on that account. Section 1 of Article VI. of the Constitution confers upon the Legislature the power to establish such special Courts, and the Legislature is the sole judge of the necessity or expediency of establishing such Courts.

It thus appears that the citizens of the county are not subjected to any pecuniary loss by said Act; and we will now consider whether the citizens are subjected to any such inconvenience as the Constitution intended to guard against. It is certain that no inconvenience accrues to those citizens residing within the territorial jurisdiction of the new Court. On the contrary, their convenience is greatly increased by having a Court brought within easier reach of them. It is equally clear that those citizens of the county residing outside of the territorial jurisdiction of the Rockwood Court are not subjected to the inconvenience intended to be guarded against.

It is claimed that such inconvenience to said

outside citizens is created by the second section of the Act. That part of said section on which the claim is based, is as follows:

"When the Court hereby established has jurisdiction of the cause of action, counterparts of writs may issue from said Court for joint defendants residing out of said districts, as are issued by the Circuit Court of the State to other counties, and counterparts may issue to any other counties in the State as in Circuit Courts."

The claim is that a citizen residing in a distant part of the county, outside of the sixth, seventh, eleventh, twelfth, and thirteenth districts, may be compelled to attend the Rockwood Court, when he is sued jointly with a resident of said districts, and served with a counterpart writ. So the same citizen may be compelled to go to a distant county when served with a counterpart writ. We think the inconvenience here complained of is not such as can affect the validity of the Act.

In further support of the views already expressed, we may add that the Magistrates' Courts are Courts established by the Legislature under the power conferred by the Constitution. The Justices of the Peace hold these Courts, away from the county seat, in the separate civil districts in which they reside. The judgments of these Courts, within the limits of their jurisdiction, are just as valid and binding as the judgments of any other Court, unless appealed from. It cannot be contended that the seat of justice is removed to a particular civil

district, because the Justice of the Peace holds his Court in that district, instead of at the county seat.

Our conclusion is that the Act of January 27, 1891, establishing the Law Court of Rockwood does not purport to remove the seat of justice of Roane County from Kingston to Rockwood, and is not obnoxious to that part of Section 4 of Article X. of the Constitution quoted above.

Whether or not it is good policy to establish such Courts is a question for the Legislature. We only pass on the question of the constitutional power of the Legislature. It determines its own policy.

It is next insisted that the fifth section of said Act is unconstitutional, because that section requires the jurors for the Rockwood Court to be taken from the resident citizens of the sixth, seventh, eleventh, twelfth, and thirteenth civil districts of the county, instead of from the citizens of the whole county, or, as counsel says, from "the body of the county."

Section 9 of Article I. of the Constitution provides that, in prosecutions by indictment or presentment, the accused has the right to have a "speedy public trial by an impartial jury *of the county.*"

If the jury is made up of citizens of any part of the county, who are otherwise qualified, the requirement of the Constitution is complied with. The common impression that the jury must come from the entire county is derived from the Code,

7—8 P

§ 3985, which requires that one of the jurors designated for the Circuit Court "shall reside in each civil district into which the county is divided, and where the number of districts and the number of jurors do not coincide, the selection should be made with as much equality as possible. But § 3987 provides that "no mistake or omission, however, in complying with the above provisions in regard to the residence of the jurors designated shall amount to a disqualification." The Code provision thus appears, by its own terms, to be directory merely; and, if this were not so, still the Code is no more than an Act of the Legislature, and is subject to be amended or repealed by subsequent Acts.

It is next insisted that the indictment was found by a grand jury selected from the sixth, seventh, eleventh, twelfth, and thirteenth districts, and not from the entire county. The Act itself does not require the grand jurors to be taken exclusively from these five districts, but the objection of counsel is to the *fact* that they were so taken. This fact does not appear in the record, except that it is asserted in the reasons in arrest of judgment. If there was any thing in the objection, it should have been made *in limine*, and comes too late after the plea of not guilty and verdict upon that issue. *State* v. *Cole*, 9 Hum., 626; *McTigue* v. *State*, 4 Bax., 314; *Turner* v. *State*, 5 Pickle, 559.

But, if in time, there is nothing in the objec-

tion, for the reasons shown in discussing the objections to the trial jury.

When the jury was being impaneled, and eight jurors had been accepted, the Attorney-general stated that he had reliable information that two of said eight jurors had expressed an opinion as to the guilt of the defendant before they were taken upon the jury. The Court heard evidence on the point, and found the charge to be true, and discharged the two disqualified jurors. The prisoner's counsel promptly demanded that the other six jurors be discharged, upon the ground that they had been associated with the two discharged jurors for a day and night, and had been tainted by the influence of their opinion. The demand was refused by the Court. It does not appear affirmatively that the six remaining jurors were influenced by the opinions of the two discharged, or that such opinions were made known to them. On the other hand, it does appear that the Court again interrogated the six remaining jurors, touching their qualification, and each one answered the various questions propounded by the Court, and showed that they were all competent, and had not been tainted.

In *Taylor* v. *The State*, 11 Lea, 720, Judge Cooper said: " Upon principle, in the absence of any thing else, the mere association of selected jurors with one of their number who had formed and expressed an opinion as to the guilt of the defendant, would no more render them incom-

petent than such association previous. to the trial."

In that case, it is true, the defendant made no motion to discharge the remaining jurors; but we think the principle above stated is correct.

In *Boyd* v. *The State*, 14 Lea, 169, it was held that "no presumption of improper communications will arise, but the burden is upon defendant to show any impropriety, if imputed to them."

We think this doctrine is sound, and we fail to see how mere association with the two discharged jurors would contaminate the remaining six, especially in view of the fact that these six were subsequently interrogated, and showed affirmatively that they had not been contaminated.

On his motion for a new trial, the prisoner produced affidavits to show that two of the jurors who rendered the verdict against him had formed and expressed the opinion that he was guilty before they were taken upon the jury; and this was not known to the prisoner until after the jury had been sworn and a part of the evidence had been given to the jury.

The Constitution guarantees to the accused a trial by an "impartial" jury. If any one of the jurors is not impartial, the verdict must be set aside.

One of the jurors attacked is I. N. Derrick. When put upon his *voir dire*, he qualified as competent.

The affidavit of J. L. Taylor states that, some

time before the trial, he and Derrick were talking about the Ellis case, "and Derrick was relating over the facts of the case. Among other things, he said that Ellis held the woman by the hand while he shot her, and kept shooting her until she died. He was talking about the cruelty of the defendant to the woman, and said he thought he ought to be hung if he did that."

The affidavit of J. N. Hill states that he said to Derrick, some time before the trial, that he (affiant) had no doubt defendant was guilty, "and Derrick said the defendant was guilty, but he did not say of what degree of crime."

The affidavit of C. L. Haga states that, some time before the trial, affiant and Derrick were talking about the difficulty of securing a jury, and affiant said if he was on a jury like that, he would hang the man for killing a woman. Derrick said, "I would too." "There was more said on the subject, but affiant cannot recollect exactly."

Derrick's affidavit is filed, and he denies substantially all the statements made in the affidavits of Taylor, Haga, and Hill, and swears that, until he heard it on the trial, he had never heard any one who claimed to know the facts state them, and had never heard that defendant held the woman by the hand and shot her; and that he told the Court, when interrogated, that he had an impression made upon his mind by rumor, but he felt that he could disregard that impression and be governed by the law and the evidence. Derrick's

affidavit is supported by the affidavit of seven men, who swear that Derrick's character is good, and they do not believe he would go into the jury-box and try a cause upon any thing except the law and the evidence. It is not shown in any of the impeaching affidavits that Derrick claimed to know the facts, or to have heard them stated by any one who professed to know them. Taylor's affidavit shows that Derrick said he thought Ellis "ought to be hung *if he did that*," showing his opinion was based on a hypothetical case. Haga's affidavit shows that "more was said on the subject," which he could not recollect. The part not recollected might have shown that Derrick was speaking of a hypothetical case, or that his opinion was based on rumor. Derrick's affidavit shows that he stated on his *voir dire* that he had an impression, which was based on rumor, and that he did not know the facts, and never heard them detailed by any person who professed to know them, and his veracity and character are sustained by the affidavits of seven disinterested witnesses. Upon this testimony, we are constrained to hold that the impartiality of the juror, Derrick, has not been successfully impeached.

The affidavits of David Taylor, W. H. Booth, and William Little were offered to impeach the impartiality of the juror, Nelson.

David Taylor's statement is that "he and Nelson talked about the case, and as to what they had heard about the facts in the case, and Nel-

son said he ought to be penitentiaried, and he may have said for what length of time, but he does not remember that."

William Booth's statement is that Nelson said "he could not give him justice on the trial; he ought to be hung, and that he knew that the defendant could overpower a woman; that a man that could not govern himself about a woman, and then kill her, ought to be hung."

William Little says he heard Nelson say, about ten days before the trial: "If I am caught on that jury, I'll hang Sam Ellis."

Nelson's affidavit emphatically denies the statements of William Little and W. H. Booth, but says he may have had casual conversations about the case with David Taylor; denies that Taylor ever related the facts to him, or pretended to do so, and states that affiant has no recollection of ever expressing any opinion in the matter; that he had never heard any of the evidence before he heard it on the trial, and was absolutely ignorant of the facts in the case when he went into the jury-box.

This juror qualified twice on his *voir dire*—once when he was accepted, and again after the jury was made up, and before they were sworn, as a completed panel, to try the issues. Five witnesses swear that he is an honest, truthful man, and they are satisfied he would not corruptly go on a jury for an improper purpose; and they believe he would try the case honestly, according to the law and the evidence, as he understood it.

The trial Judge was of the opinion that the impartiality of Nelson, as a juror, had not been successfully assailed.

If. the opinions attributed to this juror by the three affiants, were actually expressed by him, and were based upon a knowledge of the facts, or upon a statement of the facts made to him by some person who did know, or professed to know them, then he was disqualified to sit as a juror in the case. To whom shall we give credit, the three affiants—Taylor, Booth, and Little—or Nelson and the five affiants who sustain his character? Nelson swears that he went into the jury-box entirely ignorant of the facts of the case, and heard the evidence for the first time on the trial. If this is true, and he had any opinion before that time, it must have been based on rumor. Taylor says he and Nelson were talking about what they had heard about the facts in the case, but does not say how they heard about them.

In the case of *Mann* v. *The State,* 3 Head, 373–376, the opinions alleged to have been expressed by the jurors were quite as strong as in this case. The Court said: "From the fact that he [the juror] was selected, he must be presumed competent. To overthrow this, a clear case must be made out against it. He was elected by the defendant, and he must show a stronger case against him after trial than would be necessary to set him aside before he was selected. All that appears in these affidavits is, that he expressed

strong and decided opinions against the prisoner. That would not have disqualified him in the first instance, if they were formed from rumor. Our decisions are so numerous on this subject that the question in every aspect has been settled. * * * The three affidavits introduced against him only show simply that he did express an opinion against the prisoner, without stating the source from which it was derived, whether from having heard the witnesses or from the facts as reported. So all that is proved against him may be true, and yet he be competent, according to the rule on that subject. It may be that all the juror said in these loose and idle conversations was not recollected or stated in the affidavits."

This doctrine was expressly approved in the case of *Rader* v. *The State*, 5 Lea, 613, 614.

To the same effect is the case of *Johnson* v. *The State*, 11 Lea, 49, 50; and in that case stress is laid upon the fact that the juror is shown to be a man of good character. The doctrine is reasserted in the case of *Spence* v. *The State*, 15 Lea, 547, 548.

These cases make it clear that the Circuit Judge was not in error in refusing a new trial on the ground of the disqualification of the jurors, Derrick and Nelson.

It is next insisted that the trial Judge committed an error in admitting the evidence of the witness, L. T. Holland. The ground upon which this testimony was objected to was that the rela-

tion of attorney and client existed between the
defendant and the witness, and that the testimony
of the witness would divulge confidential commu-
nications. It appears affirmatively that the witness
was not the attorney of the defendant at the
time of the communications alluded to, and has
not been since. After the conversation deposed to
by the witness, defendant's father asked the wit-
ness to stay over till the next day and defend his
son if he should be arrested. Witness did not
stay over, and has never represented the defend-
ant. This evidence was properly admitted.

W. R. Haggard, one of the State's witnesses,
was asked by defendant's attorney: "How many
times have you been arrested charged with crime?"
To this question the Attorney-general objected,
upon the ground that the question implied a
record, and none was produced. The objection
was sustained. This action of the Court is now
assigned as error.

Immediately after this ruling of the Court, de-
fendant's attorney proceeded, without objection, to
examine the witness about a number of offenses
with which he had been charged, and he admitted
that he had been accused of murder, and tried
for it. He was also asked whether he had not
been accused of shooting into a railway passenger
train, and into a buggy in which a gentleman and
lady were riding; and was asked about a fight
he had with some of defendant's relatives; and
was made to admit that he did not like any of

Ellis *v.* State.

the Ellis family. The object of the question ruled out was to throw discredit on the witness by showing that he had been charged with crime. This was fully shown in the subsequent examination, and the evidence ruled out was admitted without objection, so that the defendant had the full benefit of it, and cannot now complain of the ruling. The evidence in the case, which we discuss orally along with this opinion, well warranted the verdict of the jury.

The judgment and sentence will be affirmed.